**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| Cogent Communications, Inc., | |
| Plaintiff, | Case No. 1:15-cv-1632 (LMB/IDD) |
| v. | |
| Deutsche Telekom AG, | |
| Defendant. | |

**COGENT COMMUNICATIONS, INC.'S COMBINED OPPOSITION TO DEUTSCHE TELEKOM AG'S MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM, LACK OF PERSONAL JURISDICTION, AND *FORUM NON CONVENIENS***

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ........................................................................................................ 2

I.   This Court Has Specific Personal Jurisdiction Over DT ....................................... 2

    A.   This Action Arises From DT's Transaction Of Business in Virginia ............................. 3

    B.   DT's Personal Jurisdiction Arguments Are Based on a Misreading of the 1999
        Agreement .................................................................................................. 4

II.  The 2004 Agreement Is Enforceable ................................................................ 7

    A.   The Complaint Alleges With Particularity the Material Terms of the Parties'
        2004 Agreement ........................................................................................ 7

    B.   DT's Arguments Against Enforcement of the 2004 Agreement Ignore
        Applicable Law .......................................................................................... 8

III. Cogent's Claims Are Timely ........................................................................ 11

    A.   The Complaint Alleges a Series of Distinct Breaches of the 2004 Agreement,
        Not a Single, Continuous Breach .................................................................. 12

    B.   Cogent's Request for Injunctive Relief is Not Time-Barred ................................... 14

IV.  Cogent Properly Pleads Alternative Claims for Breach Of The Implied Duty Of
    Good Faith And Fair Dealing ....................................................................... 15

V.   DT's *Forum Non Conveniens* Motion Should Be Denied ..................................... 15

    A.   The 2003 Agreement Did Not Foreclose the 2004 Agreement or Supersede the
        1999 Agreement ...................................................................................... 16

    B.   The 2003 Agreement Does Not Apply to Cogent's and DT's Business Relationship.... 19

    C.   Dismissal Based on *Forum Non Conveniens* Would Be Improper Even If The 2003
        Agreement Were Relevant Because It Does Not Control The Entirety Of
        The Parties' Interconnections In Virginia Or Elsewhere ...................................... 21

    D.   The Proceeding Before The German Telecommunications Regulatory Authority Is
        Irrelevant To This Dispute ........................................................................... 22

CONCLUSION................................................................................................... 24

## TABLE OF AUTHORITIES

<u>Cases</u>

*Akers v. Norfolk & W. Ry. Co.*,
   378 F.2d 78 (4th Cir. 1967) ................................................................................ 16

*American Physical Therapy Association v. Federation of State Boards of Physical Therapy*,
   628 S.E.2d 928 (Va. 2006) .......................................................................... 12, 13

*Baker v. Elam*,
   883 F. Supp. 2d 576 (E.D. Va. 2012) ................................................................. 24

*Baker v. Health Mgmt. Sys., Inc.*,
   772 N.E.2d 1099 (N.Y. 2002) .............................................................................. 24

*Bank of New York Mellon Trust Co. v. 3.1Morgan Stanley Mortgage Capital, Inc.*,
   2016 WL 1658313 (2d Cir. Apr. 27, 2016) ........................................................... 6

*Casciano v. JASEN Rides, LLC*,
   109 F. Supp. 3d 134 (D.D.C. 2015) ............................................................. 11, 17

*City of Manassas v. Prince William Cty. Bd. of Sup'rs*,
   33 Va. Cir. 286, 1994 WL 16035090 (1994) ................................................. 14-15

*Clark v. Clark*,
   535 A.2d 872 (D.C. 1987) .................................................................................... 10

*Combs v. Bakker*,
   886 F.2d 673 (4th Cir. 1989) ................................................................................. 2

*Consulting Engineers Corp. v. Geometric Ltd.*,
   561 F.3d 273 (4th Cir. 2009) ................................................................................. 3

*Corinthian Mortg. Corp v. ChoicePoint Precision Mktg., LLC*,
   2008 WL 2776991 (E.D. Va. July 14, 2008) ................................................. 11, 13

*Daisley v. Riggs Bank, N.A.*,
   372 F. Supp. 2d 61 (D.D.C. 2005) ....................................................................... 10

*Eastport Ventures, Ltd. v. Kariman*,
   2007 WL 783028 (E.D. Va. Mar. 13, 2007) ........................................................ 24

*Egan v. McNamara*,
   467 A.2d 733 (1983) .............................................................................................. 9

*Fed. Deposit Ins. Corp. v. Nationwide Equities Corp.*,
   2015 WL 7720633 (S.D. Fl. Nov. 30, 2015) ....................................................... 16

*Fed. Ins. Co. v. Am. Home Assur. Co.*,
   639 F.3d 557 (2d Cir. 2011) ................................................................ 9

*Goodman v. Praxair, Inc.*,
   494 F.3d 458 (4th Cir. 2007) ............................................................ 11

*Hampton Roads Sanitation Dist. v. McDonnell*,
   360 S.E.2d 841(Va. 1987) ........................................................... 12, 14

*Hansen v. Stanley Martin Cos.*,
   585 S.E.2d 567 (Va. 2003) ................................................................ 13

*Helvering v. Ethel D. Co.*,
   70 F.2d 761 (D.C. Cir. 1934) ............................................................ 18

*Heritage Oldsmobile-Imports v. Volkswagen of Am., Inc.*,
   264 F. Supp. 2d 282 (D. Md. 2003) .................................................... 11

*Hitachi Credit America Corp. v. Signet Bank*,
   166 F.3d 614 (4th Cir. 1999) .............................................................. 9

*Hunter Innovations Co. v. Travelers Indem. Co.*,
   753 F. Supp. 2d 597 (E.D. Va. 2010) ................................................ 13

*Hunter v. Custom Bus. Graphics*,
   635 F. Supp. 2d 420 (E.D. Va. 2009) ............................................ 13, 14

*Indep. Energy Corp. v. Trigen Energy Corp.*,
   944 F. Supp. 1184 (S.D.N.Y. 1996) .................................................... 18

*Jones v. R.S. Jones and Assoc.*, Inc.,
   431 S.E.2d 33 (Va. 1993) .................................................................. 11

*Jung v. Jung*,
   844 A.2d 1099 (D.C. 2004) .............................................................. 24

*Kennedy v. Kennedy*,
   83 Va. Cir. 439, 2011 WL 8947419 (2011) ........................................ 18

*La France v. Georgetown Univ. Hosp.*,
   1988 WL 135066 (D.D.C. Dec. 9, 1988) .............................................. 9

*Layton v. MMM Design Group*,
   32 Fed. App'x 677 (4th Cir. 2002) .................................................... 17

*Lexie v. State Farm Mut. Auto. Ins. Co.*,
   469 S.E.2d 61 (Va. 1996) .................................................................. 9

*Mendoza v. Cederquist,*
    2009 WL 1254669 (E.D. Va. May 6, 2009) ......................................................... 15

*Muttontown Pictures, Inc. v. Levine,*
    48 A.D.2d 818 (N.Y. App. Div. 1975) ................................................................. 6

*Peanut Corp. of Am. v. Hollywood Brands, Inc.,*
    696 F.2d 311 (4th Cir. 1982) ............................................................................. 3

*Richardson & Lucas, Inc. v. New York Athletic Club of City of New York,*
    304 A.D.2d 462 (N.Y. App. Div. 2003) ............................................................. 6

*RMS Tech., Inc. v. TDY Indus., Inc.,*
    64 F. App'x 853 (4th Cir. 2003) ...................................................................... 11

*Royer v. Bd. of Cty. Supervisors of Albemarle Cty.,*
    10 S.E.2d 876 (Va. 1940) ................................................................................ 17

*Schism v. United States,*
    316 F.3d 1259 (Fed. Cir. 2002) ....................................................................... 17

*SunTrust Mortgage, Inc. v. Nationwide Equities Corp.,*
    2012 WL 4953120 (E.D. Va. Oct. 16, 2012) ................................................... 10

*Torres v. SOH Distrib. Co.,*
    2010 WL 1959248 (E.D. Va. May 13, 2010) ................................................... 16

*United States v. Johnson,*
    726 F.2d 1018 (4th Cir. 1984) ........................................................................... 6

*United States v. McLaughlin,*
    813 F.3d 202 (4th Cir. 2016) ............................................................................. 6

*Vanderhoof-Forschner v. McSweegan,*
    215 F.3d 1323, 2000 WL 627644 (4th Cir. 2000) ............................................. 9

*Virginia Innovation Sciences, Inc. v. Samsung Electronics Co.,*
    11 F.Supp.2d 622 (E.D. Va. Mar. 31, 2014) ..................................................... 6

*Wardman v. Washington Loan & Trust Co.,*
    90 F.2d 429 (D.C. Cir. 1937) ............................................................................ 9

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980) .......................................................................................... 3

*Young v. City of Mount Ranier,*
    238 F.3d 567 (4th Cir.2001) ............................................................................ 10

*Young v. New Haven Advocate,*
  315 F.3d 256 (4th Cir. 2002) ................................................................. 3

**Statutes**

Va. Code Ann. § 8.01-230 ........................................................................ 14

Va. Code Ann. § 8.01-246 ........................................................................ 11

Va. Code Ann. § 8.01-328.1 .................................................................... 3, 4

**Other Authorities**

Fed. R. Civ. P. 8(d) ............................................................................. 2, 15

17 C.J.S. Contracts § 7 ............................................................................ 17

## PRELIMINARY STATEMENT

Cogent's Amended Complaint asserts against Deutsche Telekom AG ("DT") claims for breach of a 2004 oral agreement or, alternatively, a 1999 agreement, both between Cogent and DT. In addition, Cogent asserts claims for breach of implied duties of good faith and fair dealing arising out of those contracts. DT seeks to evade discovery and adjudication of the merits in this fact-intensive case by requesting dismissal on several grounds—none of which are availing.

DT claims this Court lacks personal jurisdiction over it and the claims asserted by Cogent, but the Amended Complaint makes clear that specific personal jurisdiction exists under Virginia's long-arm statute and due process principles. Cogent's claims arise from DT's breach of its contractual obligations to provide Cogent with specific services and things in Ashburn, Virginia (among other locations). Performance of DT's contractual obligations requires it to take physical actions and expend monetary resources in Virginia, and the Amended Complaint details DT's contacts with Virginia and how Cogent's claims arise from those contacts.

DT also contends the 2004 agreement alleged in the Amended Complaint, an oral contract, is unenforceable. But that Agreement, pleaded with requisite particularity, is fully enforceable under well-established principles of contract interpretation which DT ignores.

DT further argues that Cogent's claims are time-barred. But DT misconstrues the allegations in the Amended Complaint, and, again, disregards applicable legal principles. Under Virginia law (which governs the statute of limitations here), when a claim is based on multiple, distinct wrongful acts, each occurrence inflicts a new injury and gives rise to a new and separate cause of action. The Amended Complaint alleges that DT breached its obligations at *different periods of time* during the applicable limitations period, with each instance constituting its own breach. That DT also breached its obligations outside the limitations period has no bearing on the timeliness of Cogent's claims with respect to breaches *within* that period. And DT

1

completely ignores that Cogent's request for equitable relief is not subject to a statute of limitations.

DT also mistakenly asserts that Cogent's alternative implied duty claims (Counts III and IV) are "identical to Cogent's contract claims," and therefore seeks their dismissal. But those claims are not identical: Cogent may recover on its implied duty claims only if the finder-of-fact concludes DT's wrongful acts were not proscribed by an express contractual provision. Counts III and IV are therefore alternative claims, expressly permitted by Fed. R. Civ. P. 8(d).

DT seeks dismissal based on the doctrine of *forum non conveniens* as well, contending Cogent's claims must be litigated in Germany. DT's request is predicated entirely on a 2003 agreement to which DT was not a party when executed and that has not been operative for over a decade. This argument also is at odds with Cogent's and DT's current business relationship as pleaded in the Amended Complaint. Finally, DT wrongly suggests that the dispute before this Court already has been adjudicated in a German regulatory proceeding—a claim contradicted by the opinion of DT's own putative German law expert.

For these reasons, and those detailed below, DT's motions to dismiss should be denied.

ARGUMENT

## I.     This Court Has Specific Personal Jurisdiction Over DT

To establish personal jurisdiction over a defendant at the pleading stage, "the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). In considering a jurisdictional challenge on a motion to dismiss, "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Id.*

Federal courts in Virginia sitting in diversity may exercise specific personal jurisdiction

2

where a defendant has sufficient "minimum contacts" with Virginia. *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002). The minimum contacts test, in essence, asks whether the defendant could have "reasonably anticipate[ed] being haled into court" in Virginia. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *see also Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009) (due process "protects a defendant from having to defend himself in a forum where he should not have anticipated being sued"). "Virginia's long-arm statute extends personal jurisdiction to the extent permitted by the Due Process Clause." *Young*, 315 F.3d at 261.

### A.  This Action Arises From DT's Transaction Of Business in Virginia

Cogent's claims in this action arise from DT's breach of its contractual obligations to provide Cogent with specific services and things in Ashburn, Virginia, among other locations. Performance of DT's contractual obligations requires DT to take physical actions and expend monetary resources in Virginia. Where, as here, a plaintiff's claims arise from the defendant's transaction of business and physical presence in Virginia, there is no question the defendant is subject to personal jurisdiction in Virginia courts. *See Peanut Corp. of Am. v. Hollywood Brands, Inc.*, 696 F.2d 311, 313-14 (4th Cir. 1982) (Virginia courts may exercise personal jurisdiction over "all nonresidents who transact *any business* within Virginia so long as the cause of action asserted arises from the nonresident's transaction of business.") (emphasis in original); *see* Va. Code Ann. § 8.01-328.1(A) (same).[1]

The Amended Complaint ("Complaint") catalogues DT's contacts with Virginia and how Cogent's claims arise from those contacts. As described in the Complaint:

- DT exchanges Internet traffic with Cogent and other ISPs at an "important" interconnection facility in Ashburn, Virginia. Compl. ¶ 11.

---

[1]     Cogent does not claim that DT is subject to *general* jurisdiction in Virginia.

- The Ashburn facility "handl[es] some of the world's largest exchanges of Internet traffic, and . . . includes major participants in the global market for providing Internet service to retail customers or corporate clients."  *Id.*

- "DT transacts business in Virginia to facilitate its use of the Ashburn, Virginia interconnection facility, including paying for physical space in Virginia to install and operate routers that it owns and uses to interconnect in Virginia with other network providers" such as Cogent.  *Id.* ¶ 14.

- DT's Virginia-based business activity has enabled DT to "enter into agreements with Cogent (and others) for the exchange of Internet traffic at the Ashburn" facility— including those at issue in this case.  *Id.*

- One of the contracts relevant to this action, the 1999 Agreement, was originally executed by DT and a now-defunct Virginia-based ISP called PSINet.  *Id.* ¶ 17.

- DT's contracts with Cogent and other ISPs govern the exchange of substantial amounts of Internet traffic moving through the state of Virginia on physical wires, as well as traffic that originates in Virginia or has a endpoint in Virginia.  *Id.* ¶ 16; *see* Va. Code Ann. § 8.01-328.1(B) ("Using a computer or computer network located in the Commonwealth shall constitute an action in the Commonwealth" for purposes of determining personal jurisdiction.).

- The contracts at issue in this case contemplate performance by both parties that must physically take place in Virginia at the Ashburn facility.  Specifically, the parties interconnect their Internet networks in Ashburn by placing routers in the facility and connecting them with a cable.  Compl. ¶¶ 13, 25.  They further agreed to augment their port capacity at the Ashburn facility when necessary to mitigate sustained congestion occurring at the parties' interconnection point.[2]  *Id.* ¶ 58.  Compliance with that obligation in Ashburn, among other places, is the essence of the injunctive relief sought in the Complaint.  *Id.* at 26 (Prayer for Relief ¶ (a)).

**B.  DT's Personal Jurisdiction Arguments Are Based on a Misreading of the 1999 Agreement**

DT does not dispute it has transacted business in Virginia, or that Cogent's claims arise from DT's business activities in Virginia.  *See* DT's Mem. of Law in Support of Motion to Dismiss ("DT MTD Br.") [Dkt. 22] at 4.  Moreover, DT acknowledges it is subject to personal jurisdiction in this Court if the parties' interconnection at the Ashburn facility is governed by the

---

[2]     Port augmentation is accomplished by purchasing and physically installing new port cards in the parties' respective routers.  Compl. ¶¶ 15, 25, 27.

2004 Agreement, as Cogent alleges.  *Id.* at 12-14.  DT limits its personal jurisdiction arguments to Counts III and IV in the Complaint, which pertain to Cogent's alternative claims arising under the 1999 Agreement.  *Id.*; Compl. ¶ 65 (alleging, in the alternative, that "should the finder of fact conclude that the parties' discussions in 2004 were insufficient to create a new agreement, the parties' conduct over the past fourteen years has been governed by the 1999 Agreement.").  According to DT, this Court lacks jurisdiction over alternative Counts III and IV because it believes the 1999 Agreement does not govern the parties' Ashburn interconnection.  This is purportedly because "Ashburn" is not specifically listed as one of the parties' initial peering locations, and the 1999 Agreement states that it "may be modified only in writing."  1999 Agreement [Dkt. 20 at 35] at § 6.7.  But DT misconstrues the contract and ignores relevant New York law.[3]

By its terms, the 1999 Agreement specifically contemplates the parties may add additional interconnection points beyond those listed in the agreement.  Section 3.1 of the 1999 Agreement provides that the named peering locations are merely the parties' "*initial* physical connection(s)" and that "the Parties may subsequently agree to connect at more locations than those specified."  1999 Agreement [Dkt. 25 at 33] at § 3.1 (emphasis added).  Subsequent agreements "to connect at more locations," including at Ashburn, therefore fall squarely within the 1999 Agreement's terms.  As such, the parties' decision to interconnect at a location other than Herndon is not a contractual "modification" or "amendment," but rather a step specifically contemplated by the text of the contract.  Indeed, because contracts can always be modified through a subsequent, mutual agreement, construing the addition of new peering connections as a

---

[3]      The 1999 Agreement is governed by New York law.  1999 Agreement [Dkt. 20 at 35] at § 6.7.  For the reasons described *infra* in Section II, the 2004 Agreement governs the parties' Ashburn interconnection.  But should the Court conclude that the 2004 Agreement is unenforceable, the 1999 Agreement would control.  *See* Compl. ¶ 65.

contractual "modification" would render Section 3.1's express provision for additional peering locations meaningless—making DT's reading of the 1999 Agreement incompatible with well-established rules of construction. *See Muttontown Pictures, Inc. v. Levine*, 48 A.D.2d 818, 819 (N.Y. App. Div. 1975) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect"); *United States v. McLaughlin*, 813 F.3d 202, 204 (4th Cir. 2016) ("contract terms must be construed to give meaning and effect to every part of the contract").[4]

Moreover, even if the parties' decision to exchange traffic in Ashburn were considered a "modification" of the 1999 Agreement, that modification would be enforceable under New York law. While New York law generally does not permit oral modification of contracts that expressly require modifications to be in writing, there is a recognized exception to this rule: promissory estoppel. *See Richardson & Lucas, Inc. v. New York Athletic Club of City of New York*, 304 A.D.2d 462, 463 (N.Y. App. Div. 2003). Promissory estoppel applies here because, as the Complaint makes clear, Cogent took "acts . . . in detrimental reliance" on the parties' 2002 oral modification being enforceable. *Id*. Specifically, Cogent expended time and resources

---

[4]     Separately, the 1999 Agreement references the parties' agreement to interconnect in "Virginia" and identifies "Herndon" as the specific location within Virginia. 1999 Agreement [Dkt. 20 at 33] at § 3.1. As it happened, DT and Cogent actually interconnected in Ashburn, Virginia, located only a few miles away from Herndon. *Id*. ¶ 67; *see* Google Maps, https://goo.gl/maps/WvPYkpUiMqB2 (last accessed May 3, 2016) (showing driving distance between Ashburn and Herndon as 9.1 miles); *United States v. Johnson*, 726 F.2d 1018, 1021 (4th Cir. 1984) ("geographical information is especially appropriate for judicial notice"); *Virginia Innovation Sciences, Inc. v. Samsung Electronics Co.*, 11 F.Supp.2d 622, 627 (E.D. Va. Mar. 31, 2014) (taking judicial notice of travel distances by using publicly available, online resources, including Google Maps). Under New York law, contractual parties may engage in such "minor" deviations from a contract's terms without affecting the contract's enforceability. *See Bank of New York Mellon Trust Co. v. 3.1Morgan Stanley Mortgage Capital, Inc.*, No. 14-2619-CV, 2016 WL 1658313, at *12 (2d Cir. Apr. 27, 2016).

necessary to interconnect with DT at Ashburn based on its belief that it had an enforceable contract in place. *See, e.g.,* Compl. ¶¶ 13, 45.

## II.    The 2004 Agreement Is Enforceable

### A.    <u>The Complaint Alleges With Particularity the Material Terms of the Parties' 2004 Agreement</u>

The 2004 Agreement is not an amendment to the 1999 Agreement.  It is a new agreement that replaced the 1999 Agreement.

The Complaint describes with particularity the material terms of Cogent and DT's 2004 Agreement to interconnect their networks.  As set forth in the Complaint, from 2002 until 2004, the parties exchanged traffic pursuant to the 1999 Agreement, primarily in the United States. Compl. ¶¶ 42-46.  In September 2004, Cogent acquired a German ISP, Global Access Telecom ("Gatel"), which gave Cogent a significant business presence in Germany. *Id.* ¶¶ 48-49.  Shortly thereafter, to account for the changing dynamics of their business relationship, Cogent and DT reached a new, oral agreement. *Id.* ¶ 50.  The contract was formed based on a series of discussions, principally by telephone, involving Cogent personnel located primarily in the District of Columbia, including Cogent's Washington D.C.-based peering coordinator. *Id.* ¶ 51. Pursuant to the new 2004 Agreement, Cogent and DT agreed to exchange traffic at all of their interconnections in the United States and Europe—which then included interconnection points in New York, Ashburn, Los Angeles, Frankfurt, Hamburg, and Munich—on a "settlement-free" basis (*i.e.*, without monetary compensation). *Id.* ¶¶ 52-53, 60.  In addition, a "key term" of the contract was that the parties maintain sufficient interconnection capacity to avoid sustained congestion between their networks. *Id.* ¶ 58.  While the parties never formally terminated their 1999 agreement,[5] DT and Cogent understood their new 2004 Agreement to replace and

---

[5]      DT does not deny the parties have exchanged traffic at the Ashburn facility since 2002

supersede all prior agreements pertaining to their interconnection relationship. *Id.* ¶ 59. The 2004 Agreement was orally modified in subsequent years to add interconnections in London (2006), Paris (2009), Amsterdam (2010), and Vienna, Austria (2010). *Id.* ¶ 61.

DT contends that the 2004 Agreement is "unenforceable" because any oral agreement pertaining to the parties' interconnection relationship must be construed as an "amendment to the 1999 Agreement," which "may be modified only in writing." DT MTD Br. [Dkt. 22] at 11-12. But DT's claim that the 2004 Agreement must be viewed as an (impermissible) amendment to the 1999 Agreement misconstrues Cogent's allegations. The Complaint makes clear the parties intended the 2004 Agreement to be a distinct contract—replacing, not amending, any previous agreement. *See* Compl. ¶ 59 (the "1999 Agreement . . . has been replaced by the parties' subsequent Oral Agreement to expand their relationship in the wake of Cogent's Gatel acquisition" in September 2004).

**B. DT's Arguments Against Enforcement of the 2004 Agreement Ignore Applicable Law**

DT concedes (for purposes of its motion) that District of Columbia law applies "in determining the validity of Cogent's oral contract claims."[6] However, DT ignores well-

---

pursuant to a set of binding legal obligations, including that the parties interconnect on a "settlement-free" basis. DT's position is that this relationship was not initially governed by any *written* agreement. *See* DT MTD Br. [Dkt. 22] at 13-14. DT appears to contend the parties entered into an *oral* agreement in 2002 to exchange traffic in Ashburn, while continuing to exchange traffic in New York pursuant to the 1999 Agreement. For the reasons described above, DT misreads the 1999 Agreement and ignores applicable law. But DT's position that the Ashburn interconnection was initially governed by an oral agreement between it and Cogent corroborates the Complaint's allegation that it is common in the industry for ISP peering relationships to be governed by oral agreements. *See* Compl. ¶ 28 (noting that Cogent has interconnected with several other large ISPs pursuant to unwritten contracts, including Comcast and British Telecom).

[6]    DT MTD Br. [Dkt. 22] at 10 n.5 (because the Complaint "alleges that Cogent entered into the [2004 Agreement] in the District of Columbia . . . for purposes of this motion, DT assumes that District of Columbia law will apply in determining the validity of Cogent's oral contract

established D.C. law that where contracting parties are subject to two, legally valid contracts concerning the same general subject matter but with inconsistent terms, the contract that is later-in-time controls.[7]  *E.g., Wardman v. Washington Loan & Trust Co.*, 90 F.2d 429, 432 (D.C. Cir. 1937).  As the D.C. Court of Appeals has explained:

> [T]he law in the District of Columbia is that a contract containing a term inconsistent with a term of an earlier contract between the same parties regarding the same subject matter should be interpreted to rescind the inconsistent term in the earlier contract.

*Egan v. McNamara*, 467 A.2d 733, 740 (1983); *see also La France v. Georgetown Univ. Hosp.*, No. CIV.A. 87-3400 (RCL), 1988 WL 135066, at *2 (D.D.C. Dec. 9, 1988) (under the "substantive contract law of the District of Columbia," a "new contract" that is "inconsistent with" an existing contract "discharges the existing contract even though there is no express agreement that the new contract shall have that effect") (quotation marks omitted).  And this rule applies fully where, as here, the first contract is in writing and the second contract is made orally, and even when the first contract expressly stipulates that modifications may only be made in

---

claims").  Where, as here, "the parties agree that [a certain state's] law governs their claims, we need not inquire further into the choice-of-law questions."  *Vanderhoof-Forschner v. McSweegan*, 215 F.3d 1323, 2000 WL 627644, at *2 n.3 (4th Cir. 2000); *see Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (same).  The parties' agreement on choice-of-law is fully consistent with Virginia choice-of-law rules, which apply here.  *See Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 623–24 (4th Cir. 1999).  Under Virginia law, contract claims are interpreted in accordance with the law of the jurisdiction where the contract "was made."  *Lexie v. State Farm Mut. Auto. Ins. Co.*, 469 S.E.2d 61, 63 (Va. 1996).  The Complaint alleges that the place of contracting is the District of Columbia.  Cogent's principal place of business is in the District, and the oral agreement was formed on Cogent's behalf principally by its employees located in the District.  Compl. ¶¶ 1, 51.

[7]      In addition to covering a broader set of interconnection points in both the United States and Europe than initially contemplated in the 1999 Agreement, the 2004 Agreement varies from the 1999 Agreement in other respects.  For example, the 2004 Agreement has an indefinite term and "can be terminated by either party at any time by disconnecting its network from the other party's interconnection points."  Compl. ¶ 57.  By contrast, the 1999 Agreement was valid for an initial two-year term, which automatically renewed on an annual basis unless it was terminated by either party, and was subject to detailed termination provisions.  *Id.* ¶ 41; 1999 Agreement [Dkt. 20 at 34] at § 4.3.

writing.

> Under [D.C.] contract law, it is well-settled that a written contract may be orally modified or rescinded by a subsequent oral agreement, even where the contract contains express language prohibiting oral modification.  The justification for this rule is that the existence of an express bar against oral modification does not remove the parties' continuing rights to contract anew on the subject and to modify or rescind the oral modification provision like any other term.

*Clark v. Clark*, 535 A.2d 872, 876 (D.C. 1987) (citation omitted); *see also Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 69 n.4 (D.D.C. 2005) ("It is well-settled in the District of Columbia . . . that a written contract may be modified or rescinded by a subsequent oral agreement, even where the contract contains express language prohibiting oral modification.") (quotation marks omitted).

Here, DT contends the 1999 Agreement "governs the exact same subject matter" as the 2004 Agreement "with expanded reach," DT MTD Br. [Dkt. 22] at 11.  *See* Compl. ¶¶ 48-58.  Under settled D.C. law, the 2004 Agreement—which the parties entered into to accommodate the shift in Cogent's business—displaced and superseded any prior agreements between Cogent and DT regarding interconnection, without regard to whether the prior agreements were written or oral or whether they purported to require modifications to be in writing.[8]

---

[8]   Cogent's original Complaint characterized the 2004 Agreement as an "oral and/or implied-in-fact agreement."  Original Compl. ¶ 29.  The Amended (and operative) Complaint clarifies that the contract was an express, oral agreement.  Compl. ¶ 50.  DT insinuates that Cogent's decision to amend its pleading was somehow improper—and repeatedly relies on the inoperative original Complaint in seeking dismissal.  *See* DT MTD Br. [Dkt. 22] at 1-2.  But Rule 15(a) of the Federal Rules of Civil Procedure expressly permits parties to amend their pleadings once "as a matter of course," and it is black letter law that "an amended pleading ordinarily supersedes the original and renders it of no legal effect."  *Young v. City of Mount Ranier*, 238 F.3d 567, 572 (4th Cir. 2001) ("Once an amended pleading is interposed, the original pleading no longer performs any function in the case").  DT cites no case in which a party's allegations in a superseded pleading were considered on a motion to dismiss.  And the two cases cited by DT are inapt.  The first case addressed the possible effect of an original complaint's allegations at *summary judgment*, holding that such allegations are not binding judicial admissions.  *See SunTrust Mortgage, Inc. v. Nationwide Equities Corp.* No. 3:12CV330-JRS, 2012 WL 4953120, at *4 (E.D. Va. Oct. 16, 2012).  The other case involved a plaintiff who

### III.    Cogent's Claims Are Timely

DT inaccurately contends Cogent's claims are time-barred.[9]   Virginia law applies in determining the statute of limitations for Cogent's claims, even though the relevant contracts are governed by D.C. and New York law, respectively.   *RMS Tech., Inc. v. TDY Indus., Inc.*, 64 F. App'x 853, 857 (4th Cir. 2003); *Jones v. R.S. Jones and Assoc.*, Inc., 431 S.E.2d 33, 35 (Va. 1993).   Cogent's claims for breach of the 2004 Agreement and for breach of the implied duty of good faith and fair dealing are subject to a three-year statute of limitations; its claim for breach of the 1999 Agreement is subject to a five-year limitations period.   Va. Code Ann. § 8.01-246; *Corinthian Mortg. Corp v. ChoicePoint Precision Mktg., LLC*, Case No. 1:07-cv-832 (JCC), 2008 WL 2776991, at *3 (E.D. Va. July 14, 2008).   And under the applicable law, Cogent's claims clearly are timely based on the allegations in the Complaint.   *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (The statute of limitations provides a basis for granting a motion to dismiss only in the "rare circumstances where . . . all facts necessary to [prove] the affirmative defense clearly appear *on the face of the complaint*.") (emphasis in original).

---

alleged additional facts *in its brief*, and even then the Court granted leave to amend so that the new facts could be included in an amended complaint.   *Heritage Oldsmobile-Imports v. Volkswagen of Am., Inc.*, 264 F. Supp. 2d 282, 290 (D. Md. 2003).   In addition, DT's citation to cases holding that that an "implied-in-fact" contract cannot displace an "express" contract has no bearing on the instant dispute.   The Complaint does not allege that the 2004 Agreement is an implied-in-fact contract, but rather makes clear that it is an express oral agreement.   *See Casciano v. JASEN RIDES, LLC*, 109 F. Supp. 3d 134, 140 (D.D.C. 2015) ("An implied-in-fact contract . . . has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties.").

[9]    DT misrepresents the holding of *Goodman v. Praxair, Inc.*, 494 F.3d 458 (4th Cir. 2007)—the very first case it cites in support of its argument that Cogent's claims are untimely.   *See* DT MTD Br. [Dkt. 22] at 8 (stating, erroneously, that the Court in *Goodman* dismissed the breach of contract claim as time-barred).   In *Goodman*, the Fourth Circuit **reversed** the district court's dismissal of a breach of contract claim as untimely at the motion to dismiss stage because "it was impossible to infer from the complaint the date when the breach occurred" and plaintiffs are under no obligation to plead facts bearing on possible affirmative defenses such as the statute of limitations.   *Id.* at 465-67.

A. __The Complaint Alleges a Series of Distinct Breaches of the 2004 Agreement, Not a Single, Continuous Breach__

In contending that Cogent's claims are untimely, DT ignores the nature of the contractual breaches alleged in the Complaint.   Under Virginia law, where, as here, a claim is based on multiple, distinct wrongful acts, "each occurrence inflicts a new injury and gives rise to a new and separate cause of action" for purposes of determining the applicable statute of limitations. *Hampton Roads Sanitation Dist. v. McDonnell*, 360 S.E.2d 841, 843 (Va. 1987); *see also American Physical Therapy Association v. Federation of State Boards of Physical Therapy*, 628 S.E.2d 928, 929 (Va. 2006).

The Complaint alleges that "network-wide sustained congestion has occurred *in different periods of time*" within "the past three years," and that "the most recent period began in the summer of 2013."  Compl. ¶¶ 82, 84 (emphasis added); *see id.* ¶ 88 (alleging heavy packet loss across all Cogent-DT peering points "over the period August 2015 to November 2015," and specifically identifying "the week of August 10, 2015" as a period of particular congestion at the Ashburn interconnection point).   Each instance DT refused to mitigate a discrete period of sustained congestion at DT-Cogent interconnection points on a settlement-free basis was a ***distinct breach*** of the 2004 Agreement.

In *Hampton Roads*, the Virginia Supreme Court addressed a situation in which a government sanitation system had repeatedly discharged wastewater onto the plaintiff's property over the course of nearly two decades, with the first discharge occurring well outside the limitations period.   360 S.E.2d at 843.   The Court held that "each discharge was a separate actionable event" for two reasons:  (1) "the original discharge of sewage in 1969 did not produce all the damage to the property"; and (2) "[t]he discharges were not continuous; instead, they occurred only at intervals."  *Id.* at 844; *see also id.* at 843 (contrasting a situation where "the

12

wrongful act is of a permanent nature and . . . produces all the damage which can ever result from it," in which case "the statute of limitations begins to run from the date of the wrongful act"). The Virginia Supreme Court applied *Hampton Roads* to a breach of contract action in *American Physical Therapy Association*. In that case, the plaintiff alleged the defendant breached the parties' contract by issuing a series of fee increases, the first of which occurred outside the applicable limitations period. 628 S.E.2d at 929. The Court held that each fee increase constituted a separate breach because the contractual provision barring the increases "contemplates a distinct obligation that arises each time the [defendant] imposes a new fee." *Id.* at 930.

Similarly, in *Corinthian*—a case cited by DT in its brief—the plaintiff alleged that the defendant breached the covenant of good faith and fair dealing implied in the parties' contract by repeatedly disclosing its confidential information to a third-party. 2008 WL 2776991, at *1-2 (E.D. Va. 2008). The defendant first disseminated plaintiff's confidential information outside the limitations period. However, it later disseminated plaintiff's confidential information on a monthly basis for several years, including within the limitations period. *Id.* at *1, 4. Applying *Hampton Roads* and *American Physical Therapy Association*, the Court concluded that each disclosure of plaintiff's confidential information constituted a separate wrongful act, and therefore plaintiff's claim was timely with respect to those acts occurring within the limitations period. *Id.* at 5.[10]

---

[10] None of the other cases cited by DT are to the contrary. For example, in *Hunter Innovations Co. v. Travelers Indem. Co.*, 753 F. Supp. 2d 597 (E.D. Va. 2010), the Court addressed the timeliness of a breach of contract claim for failure to remit payment on an insurance policy. *Id.* at 603-04. At issue was when the single breach accrued, not whether there were multiple, discrete breaches. *Id.*; *see also Hansen v. Stanley Martin Cos.*, 585 S.E.2d 567, 571 (Va. 2003) (addressing single contractual breach of using improper materials to construct house); *Hunter v. Custom Bus. Graphics*, 635 F. Supp. 2d 420, 428-33 (E.D. Va. 2009) (in case

Applying the principles of these cases, each time DT refused a request to mitigate sustained congestion occurring at its interconnection points with Cogent constituted a distinct breach of the 2004 Agreement (or, alternatively, the 1999 Agreement). That DT breached the contract outside the applicable limitations period has no bearing on the timeliness of Cogent's claims with respect to breaches arising *within* that period.[11] DT does not and cannot maintain that its initial breach "produce[d] all the damage to" Cogent, or that the results of its initial breach were "permanent." *Hampton Roads*, 360 S.E.2d at 843-44. As described in the Complaint, sustained congestion at DT's interconnection points with Cogent has not been permanent but "has occurred in different periods of time" within "the past three years," with "the most recent period beg[inning] in the summer of 2013." Compl. ¶¶ 82, 84; *see Hampton Roads*, 360 S.E.2d at 843 (where wrongful acts occur "at intervals," each act is a "separate actionable event"). And when sustained congestion arose most recently, DT's failure to mitigate that congestion caused Cogent new (and ongoing) damage separate from any of DT's previous breaches. *See id.* ¶ 85.

## B.  Cogent's Request for Injunctive Relief is Not Time-Barred

Cogent's request for equitable relief in the form of an "injunction requiring DT to perform its obligations under the 2004 Agreement or, alternatively, the [1999 Agreement]," *id.* at 26 (Prayer for Relief ¶ (a)), is not subject to the statute of limitations. *See* Va. Code Ann. § 8.01-230 (statutes of limitations do not apply "where the relief sought is solely equitable"); *City of*

---

alleging violations of ERISA and employment contract, claims accrued when the employer stopped making the required payments); *see also id.* at 431 (addressing statute of limitations at summary judgment, and noting that "[w]hether the defendant's actions constituted a single, continual breach or a series of separate breaches depends upon the relevant facts," including "the nature and type of each individual transaction that supposedly constituted a breach") (quotation marks omitted).

[11]     Cogent does not seek damages unavailable due to the statute of limitations.

*Manassas v. Prince William Cty. Bd. of Sup'rs*, 33 Va. Cir. 286, 1994 WL 16035090, at *8 (1994) ("where purely equitable issues are at stake, statutes of limitations do not apply").

**IV.    Cogent Properly Pleads Alternative Claims for Breach Of The Implied Duty Of Good Faith And Fair Dealing**

The Federal Rules of Civil Procedure permit parties to plead alternative theories of relief, even if those theories are inconsistent.  Fed. R. Civ. P. 8(d)(1)-(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. . . .  A party may state as many separate claims or defenses as it has, regardless of consistency."); *Mendoza v. Cederquist*, No. 1:09 Civ. 163 (LMB), 2009 WL 1254669, at *3 (E.D. Va. May 6, 2009) ("a plaintiff is permitted to plead equitable theories of relief . . . as alternatives to contract recovery").  That is what Cogent has done here in asserting claims both for breach of contract and for breach of the implied duty of good faith and fair dealing.  DT's contention that Cogent's "implied duty claims are identical to the contract claims," DT MTD Br. [Dkt. 22] at 11, ignores these implied duty claims are *alternatives* on which Cogent may recover only if the finder-of-fact concludes that DT's wrongful acts were not proscribed by an express contractual provision.  Because these are alternative claims they cannot possibly overlap in application.  *See Mendoza*, 2009 WL 1254669, at *3 (pleading alternative claims permissible even though plaintiff "will not be able to recover on both his contract and implied contract claims for the same matters . . . [W]hether the parties had an express or implied contract, and, if so, the terms of such a contract, are matters to be resolved after discovery, not on a motion to dismiss").

**V.    DT's *Forum Non Conveniens* Motion Should Be Denied**

The Court should deny DT's second motion to dismiss, asserting this case must be adjudicated in Germany.  That motion depends on resurrection of a forum selection clause from a

2003 agreement (to which DT was not a party when executed) that has not been operative for over a decade, and on the misleading suggestion that the dispute before this Court already has been litigated in a German regulatory proceeding.[12]   Moreover, in analyzing whether the forum selection clause is relevant and should be enforced, "the Court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Fed. Deposit Ins. Corp. v. Nationwide Equities Corp.*, No. 15-cv-21872, 2015 WL 7720633, at *1 (S.D. Fl. Nov. 30, 2015); *see also Torres v. SOH Distrib. Co.*, No. 10-cv-179, 2010 WL 1959248, at *2 (E.D. Va. May 13, 2010) (explaining that when deciding a motion to dismiss based on a forum selection clause, "all inferences must be drawn in favor of the plaintiff, and the facts must be viewed as the plaintiff most strongly can plead them").

### A. The 2003 Agreement Did Not Foreclose the 2004 Agreement or Supersede the 1999 Agreement

DT concedes the 2003 Agreement upon which its *forum non conveniens* motion depends was executed by Cogent and T-Systems, and represents that the agreement was transferred from T-Systems to DT in 2005.  DT's Mem. of Law in Support of *Forum Non Conveniens* Motion to Dismiss ("DT FNC Br.") [Dkt. 25] at 3 ("In 2003, Cogent entered into a written peering agreement with DT's wholly-owned subsidiary T-Systems"); *id*. at 5 ("By a publically disclosed demerger and takeover transaction in August 2005, DT acquired the ICSS division from T-

---

[12]     In its *forum non conveniens* motion, DT does not attempt to show that private factors warrant transfer of the case to Germany absent the forum selection clause.  The only factors they discuss are public factors—and, for these, they depend on a declaration that does not even consider, let alone analyze, the correct complaint.  *See* Burger Decl. [Dkt. 25-4 at 3] at ¶ 5 (explaining he reviewed "the complaint filed in this action dated December 8, 2015") (executed March 9, 2016).  Because the Burger Declaration does not address the operative complaint—in fact, it was executed before the Amended Complaint was even filed—the Court should disregard or strike it.  Moreover, DT cannot meet its burden of showing that dismissal is appropriate under *forum non conveniens* absent the forum selection clause.  *Akers v. Norfolk & W. Ry. Co.*, 378 F.2d 78, 80 (4th Cir. 1967) (explaining it is "the primary right of the plaintiff to choose his forum," which is "a selection not easily to be overthrown").

Systems. . . . As a result of the transaction, the 2003 Agreement was transferred to DT."). Because DT was not a party to the 2003 Agreement when it was executed, the 2003 Agreement with T-Systems could not (and did not) preclude a 2004 Agreement between Cogent and DT.[13]

Confronted with the fact that it was not a party to the 2003 Agreement when executed, DT asks the Court to disregard what actually occurred, and belatedly substitute it as the original party to the 2003 Agreement because "even though [it] was executed by T-Systems, it expressly requires interconnection to the <u>DT network</u> using the <u>DT AS number</u>."  DT FNC Br. [Dkt 25] at 13 (emphasis in original).  But the use of a given AS number or network by T-Systems did not transform the identity of the parties to the 2003 Agreement.  And DT repeatedly has conceded in its filings before this Court that it and T-Systems had separate corporate identities at the time of the 2003 Agreement, *id*. at 3, 5, and that, as a result, the 2003 Agreement had to be ***transferred to*** DT two years later, in 2005.

DT's attempt to substitute itself as an original party to the 2003 Agreement also underlies its claim that the 2003 Agreement superseded the 1999 Agreement.  *Id*. at 11.  The 1999 Agreement was between DT and PSINet, with Cogent later acquiring the interest of PSINet in

---

[13]     This is illustrated by the fact that all of the cases DT cites to support its argument that the 2003 Agreement forecloses the 2004 Agreement involve the same parties.  DT FNC Br. [Dkt. 25] at 12; *Casciano v. JASEN Rides, LLC*, 109 F. Supp. 3d 134, 141 n.2 (D.D.C. 2015) (discussing the implications of the existence of a written contract between the plaintiff and defendant for an alleged implied-in-fact agreement between the parties); *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (holding that alleged promise by the Air Force of lifetime medical care to two recruits was foreclosed by written enlistment agreement with those recruits); *Layton v. MMM Design Group*, 32 Fed. App'x 677, 682 (4th Cir. 2002) (rejecting an implied agreement between the plaintiff and defendants when written agreements existed between those same parties); *Royer v. Bd. of Cty. Supervisors of Albemarle Cty.*, 10 S.E.2d 876, 881 (Va. 1940) (holding that a plaintiff's quantum meruit claim against the defendant was precluded by written agreement with that defendant); *see also* 17 C.J.S. Contracts § 7 ("The rule that the existence of an express contract excludes an implied contract has full effect only when the parties to the express contract are the same as the parties to the action.").  Of course, as explained above, these cases are also inapposite because they address implied contracts rather than express contracts. *See supra* note 8.

the contract.  Compl. ¶¶ 39-43.  In contrast, T-Systems was a party to the 2003 Agreement, while

DT was not.  It is well established that a contract entered into by one party cannot supersede a

contract entered into by a different party.  *Helvering v. Ethel D. Co.*, 70 F.2d 761, 764 (D.C. Cir.

1934) (a subsequent agreement must be "made by the same parties" for that agreement to

supersede an earlier agreement on the same subject).  And DT does not cite any cases to the

contrary.   In fact, DT's cases all address situations where a contract supersedes an earlier

contract entered into by the ***same*** party.  *See* DT FNC Br. [Dkt. 25] at 11; *Kennedy v. Kennedy*,

83 Va. Cir. 439, 2011 WL 8947419, at *1 (2011) ("[w]here *the parties to an existing contract*

enter into a new agreement") (emphasis added); *Indep. Energy Corp. v. Trigen Energy Corp.*,

944 F. Supp. 1184, 1195-96 (S.D.N.Y. 1996) (holding that a written agreement between the

plaintiff and defendant superseded an earlier oral agreement between them).

DT also inaccurately claims that Cogent has "repeatedly acknowledged DT's ownership

of the 2003 Agreement."  The basis for this assertion is Cogent's communications with Maureen

Carroll, who was identified as a contact person for T-Systems in the 2003 Agreement.  DT FNC

Br. [Dkt. 25] at 5.  But Cogent's reason for contacting Ms. Carroll is simple, and has nothing to

do with her being listed as a contact person on the 2003 Agreement between T-Systems and

Cogent: Ms. Carroll is (and has been for many years) DT's "Director of Group Peering."  Carroll

Decl. [Dkt. 25-1 at 2] at ¶ 1.  And Cogent has regularly communicated with several other DT

employees about the parties' interconnections, including Falk Bornstaedt, Frank Orlowski, and

Ken Robinson.  Declaration of Art Giannopoulos ¶ 6 ("Giannopoulos Decl.") (attached hereto as

Exhibit 1).   With nothing to substantiate its conclusory assertion about the reason Cogent

communicates with Ms. Carroll, DT points to a November 3, 2009 email from Cogent's Art

Giannopoulos to Ms. Carroll.  Carroll Decl. [Dkt. 25-1 at 4] at ¶ 9.  But this email is of no help to

DT: it *does not even mention* the 2003 Agreement.  Indeed, it is about adding capacity in Frankfurt, Germany—a location not covered by the 2003 Agreement—and DT did not even provide the Court with the email's attachments.  Moreover, to Mr. Giannopoulos's knowledge, "the 2003 Agreement has never been referred to in the regular course of business regarding the interconnection relationship of DT and Cogent."  Giannopoulos Decl. ¶ 5.

### B.   The 2003 Agreement Does Not Apply to Cogent and DT's Business Relationship

As explained in the Complaint, Cogent and DT's current interconnection relationship is governed by an oral agreement that was initially made in 2004 and has subsequently been amended to remove certain interconnection locations and to include additional interconnection locations and capacities.  Compl. ¶¶ 46-64.  This oral agreement was reached after Cogent's acquisition of Gatel, which resulted in an important change in the interconnection relationship between Cogent and DT: before, the relationship was primarily focused on the exchange of Internet traffic within the United States; after, the relationship expanded to cover the exchange of Internet traffic within the United States, Europe, and between the two.  *Id.* at ¶¶ 47-52.[14]

Although DT disputes the 2004 Agreement controls the parties' interconnection relationship, it concedes that, in addition to Ashburn and New York, the parties interconnect in Los Angeles, London, Paris, Amsterdam, Frankfurt, and Vienna, Austria, none of which are referenced in the 2003 Agreement.  *See* DT FNC Br. [Dkt. 25] at 2 ("Cogent and DT interconnect at eight locations: . . . .").  In addition, DT does not dispute that the parties route transit traffic to the United States.  *See* Compl. ¶ 52.  These points underscore why the 2003 Agreement cannot govern the parties' current interconnection relationship.

First, the 2003 Agreement explicitly provides for interconnection in only two locations:

---

[14]    As explained in the Complaint, if the 2004 Agreement is inapplicable, the 1999 Agreement governs the parties' interconnection relationship.  Compl. ¶¶ 65-72.

New York and Virginia.   2003 Agreement [Dkt. 20 at 38] at § 2(2) ("the Parties hereby determine the peering point(s) pursuant to Annex 4 at which the traffic shall be transferred"); *id*. [Dkt. 20 at 47] at Annex 4 (listing only "Equinix Ashburn" and "PAIX New York, NY"). Moreover, the 2003 Agreement does not include a provision (like the 1999 Agreement's Section 3.1) that expressly contemplates the addition of other locations.  *Id*. [Dkt. 20 at 38] at § 2(2) (specifying the interconnection locations with no discussion of future additions); *id*. [Dkt. 20 at 42] at § 14(1) ("Any amendments to this Agreement must be made in writing.").  Yet, as noted, DT acknowledges that it and Cogent interconnect at six other locations not covered by the 2003 Agreement.

Second, the 2003 Agreement does not govern Cogent and DT's interconnection relationship because the 2003 Agreement expressly *prohibits* routing transit traffic to the United States: "Both Parties are hereby expressly prohibited from routing transit traffic to the United States."  2003 Agreement [Dkt. 20 at 39] at § 3(2).[15]  Yet it is undisputed that the parties have done precisely what is forbidden by express language in the 2003 Agreement.  Giannopoulos Decl. ¶ 4.[16]

_____

[15]    Transit traffic typically refers to large volumes of data sent by commercial customers, such as streaming video providers.  Giannopoulos Decl. ¶ 4.  By way of illustration, if this provision were operative then transit traffic originating with a Cogent transit customer in Nice, France and destined for a DT customer in Cologne, Germany could not be routed by Cogent to Ashburn and handed off from Cogent to DT in Ashburn for ultimate delivery to DT's customer. Today, under the parties' current relationship, there is no such prohibition.  This allows Cogent, in an effort to use relatively less congested ports between the Cogent and DT networks, to engage in routing practices that result in transit traffic flowing from Europe to the United States. *Id*.

[16]    This limitation on routing transit traffic to the United States also undermines DT's argument that the 2003 Agreement governs the parties' interconnection relationship because T-Systems and DT have used the same AS Number and network.  DT FNC Br. [Dkt. 25] at 4-5. The use of a common AS Number and/or network does not mean that the contractual relationships are necessarily the same, which is confirmed by the fact that neither the 2004 Agreement or the 1999 Agreement have this limitation.

Third, contrary to DT's suggestion that Cogent has conceded the ongoing salience of the 2003 Agreement, Cogent informed German regulators and DT long before this lawsuit that the 2003 Agreement was "out of date and no longer binding."  *See* Feb. 16, 2010 Cogent Letter to German Regulator [Dkt. 20 at 58] at 8.  DT tries to downplay Cogent's 2010 statement, as well as DT's own failure to take issue with Cogent's statement to German regulators in DT's responsive filing, by pointing to a statement by DT in a filing made *before* Cogent's that the "agreement has not yet been terminated."  Nov. 3, 2009 DT Letter to German Regulator [Dkt. 25-3 at 16] at 14.  But the two statements are not mutually exclusive.  The 2003 Agreement was never formally terminated, but it long ago stopped governing the activities of Cogent and DT— as Cogent advised German authorities six years ago.   And DT's brief to this Court fails to actually quote its filing, which makes clear DT recognized in 2009 that the 2003 Agreement did not govern the parties' interconnection relationship at that time.   DT explained to German regulators seven years ago that the 2003 Agreement *"does not regulate the capacities"* and it *"is no longer up to date" "[w]ith respect to the interconnection points."  Id*. (emphasis added).

**C.** **Dismissal Based on *Forum Non Conveniens* Would Be Improper Even If The 2003 Agreement Were Relevant Because It Does Not Control The Entirety Of The Parties' Interconnections In Virginia Or Elsewhere**

For all of the reasons discussed above, the 2003 Agreement, and its forum selection clause, are irrelevant to the case before this Court and thus do not require the case to be litigated in Germany.   But even if the 2003 Agreement were somehow relevant to the parties' interconnection relationship, the forum selection clause would not require the *entire dispute* identified in Cogent's Complaint to be litigated in Germany.   There is no dispute the parties interconnect in six locations not identified in Annex 4 of the 2003 Agreement.  DT's breaches

related to those six locations are not governed by that Agreement.[17]   And even with respect to the

Ashburn and New York interconnections, the 2003 Agreement does not govern the entirety of

the parties' interconnection relationship because Section 3(2) provides that "[b]oth Parties are

hereby expressly prohibited from routing transit traffic to the United States," 2003 Agreement

[Dkt. 20 at 39] at § 3(2), but during the period relevant to this case transit traffic has been routed

to the United States.  Giannopoulos Decl. ¶ 4.  And the only agreements that have been identified

as governing the routing of this transit traffic are the 2004 Agreement and, before that, the 1999

Agreement.

### D. The Proceeding Before The German Telecommunications Regulatory Authority Is Irrelevant To This Dispute

DT claims, or at least insinuates, the dispute before this Court was previously adjudicated

in Germany during a proceeding before the German Federal Network Agency for Electricity,

Gas, Telecommunications, Post, and Railway (the "German Regulatory Proceeding").  DT FNC

Br. [Dkt. 25] at 2, 7-8.  And it accuses Cogent of "forum-shopping" to avoid this "Prior

Proceeding" that (supposedly) resulted in a "negative precedent in Germany" where "Cogent

unsuccessfully sought the same relief" it does here.  *Id*. at 2, 7-8.  DT's arguments about the

---

[17]     DT cannot credibly argue the 2003 Agreement governs anything other than New York and Ashburn given its position that the 1999 Agreement can govern nothing other than New York absent written amendment.  *See* 2003 Agreement [Dkt. 20 at 38, 42] at §§ 2(2), 14(1); DT FNC Br. [Dkt. 25] at 10-11.  The 2003 Agreement also has a written amendment requirement (and does not have a provision like Section 3.1 of the 1999 Agreement) such that, by DT's reasoning, the 2003 Agreement cannot govern the parties' interconnection relationship absent written amendments adding locations, which DT does not contend exist.  This means that, under DT's logic, the 2003 Agreement cannot cover the six other locations at which the parties exchange Internet traffic (and constitute the majority of the total interconnection capacity between the networks).  Giannopoulos Decl. ¶ 3.

German Regulatory Proceeding are baseless.[18]

The German Regulatory Proceeding did not concern the parties' *contractual* obligations. Instead, the proceeding was focused solely on whether DT was violating the German Telecommunications Act ("TKG") by refusing to augment capacity.   German Regulatory Proceeding Order [Dkt. 25-2] at 3 (explaining that Cogent's request was "pursuant to Sections 18, 25(1) and 5 of the German Telecommunications Act [TKG].").[19]   No contractual issues were before, or decided by, the German regulatory agency.   It is therefore unsurprising that DT's putative German law expert concluded in his Declaration (albeit directed to the original complaint, not the operative complaint) that the decision by the German regulatory agency "*does not* preclude Cogent from filing a Complaint in a German court."   Burger Decl. [Dkt. 25-4 at 10] at ¶¶ 35-36 (emphasis added).   In other words, DT's own expert opined that the German Regulatory Proceeding had no preclusive effect on any contractual claims asserted in this case by Cogent.

---

[18]     Notably, DT has not sought dismissal on the basis of any purported preclusive effect of the "negative precedent" before the German regulatory agency.   Presumably, that is because there was no such "negative precedent" and the proceeding is irrelevant to this case.

[19]     *See also* German Regulatory Proceeding Order [Dkt. 25-2] at 3 ("the Ruling Chamber has decided to refrain from initiating proceedings against the Respondent to impose access obligations *pursuant to Section 16 TKG*.   Your client's request for an administrative order filed *pursuant to Section 25 TKG* for a network interconnection is rejected *a limine*.") (emphasis added).

## Conclusion[20]

For the foregoing reasons, DT's motions to dismiss should be denied.[21]

Dated:  May 6, 2016

_/s/_ _____

Scott D. Helsel
Va. Bar No. 38647
Walton & Adams, P.C.
1925 Isaac Newton Square, Suite 250
Reston, Virginia 20190
T: (703) 790-8000
F: (703) 790-8016
shelsel@walton-adams.com

Robert M. Cooper, *pro hac vice*
Scott E. Gant, *pro hac vice*
Hershel A. Wancjer, *pro hac vice*
James A. Kraehenbuehl, *pro hac vice*
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
T: (202) 237-2727
F: (202) 237-6131
rcooper@bsfllp.com
sgant@bsfllp.com
hwancjer@bsfllp.com
jkraehenbuehl@bsfllp.com

---

[20]    Without citing any authority, DT asks for attorneys' fees and costs.  DT FNC Br. [Dkt. 25] at 20.   There is no basis for such a request, and under the "American Rule" "a prevailing litigant ordinarily may not recover attorneys' fees from the defeated party when a case is concluded." *Jung v. Jung*, 844 A.2d 1099, 1107 (D.C. 2004) ("The District of Columbia applies the general principles of the 'American rule' on attorneys' fees."); *Baker v. Elam*, 883 F. Supp. 2d 576, 579-80 (E.D. Va. 2012) (same, Virginia law); *Baker v. Health Mgmt. Sys., Inc.*, 772 N.E.2d 1099, 1103-04 (N.Y. 2002) (same, New York law).

[21]    For the reasons discussed, DT's motion to dismiss on the basis of *forum non conveniens* should be denied now.  But the Court can also defer ruling on DT's arguments until summary judgment.  *See Eastport Ventures, Ltd. v. Kariman*, No. 06-cv-1177, 2007 WL 783028, at *7 (E.D. Va. Mar. 13, 2007) (holding, where the facts relevant to the *forum non conveniens* analysis were "murky," that the case should proceed through discovery after which the question would be revisited).

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 6th day of May 2016, I filed the foregoing document via CM/ECF and served the foregoing document electronically via CM/ECF and via hand delivery to the office for DT's counsel:

Attison Leonard Barnes, III (Va. Bar No. 30458)
*Attorney for Deutsche Telekom AG*
Wiley Rein LLP
1776 K St, NW
Washington, DC 20006
T: (202) 719-7000
F: (202) 719-7049
Email: abarnes@wileyrein.com


Respectfully submitted,



_____/s/_____
Scott D. Helsel (Va. Bar No. 38647)
Walton & Adams, P.C.
1925 Isaac Newton Square, Suite 250
Reston, Virginia 20190
T: (703) 790-8000
F: (703) 790-8016
shelsel@walton-adams.com